**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-15-00500-CV**

_____

**IN RE COMMITMENT OF MICHAEL LOEVITICUS TERRY**

**On Appeal from the 435th District Court**
**Montgomery County, Texas**
**Trial Cause No. 15-05-04647-CV**

**MEMORANDUM OPINION**

The State of Texas filed a petition to commit Michael Loeviticus Terry (Terry or Appellant) as a sexually violent predator. *See* Tex. Health & Safety Code Ann. §§ 841.001-.151 (West 2010 & Supp. 2016) (SVP statute).[1] A jury found that Terry is a sexually violent predator. Terry filed a motion for judgment notwithstanding the verdict and a motion for new trial. The trial court denied both motions. The trial court rendered a final judgment and an order of civil commitment, and Terry timely filed a notice of appeal. In three issues, Terry

_____

[1] Throughout this opinion, we cite to the current version of the statute unless a previous version of the statute applies and the subsequent amendments would materially affect our analysis.

1

challenges the constitutionality of the SVP statute as amended, the admission of certain evidence at trial, and the sufficiency of the evidence. We affirm the trial court's judgment and order of civil commitment.

EVIDENCE AT TRIAL

Admission of Exhibits

Prior to the trial, defense counsel informed the trial court that Terry did not wish to be present during the voir dire or during any other part of the trial. The trial court ruled that Terry would be required to testify because he was under a subpoena, but otherwise the trial court granted Terry's request. Terry's attorney was present during and participated in all stages of the trial.

At the beginning of the trial, the State offered Terry's pen packet into evidence as Exhibit 1. The defense counsel objected to the exhibit stating that Terry's photograph in the pen packet was unduly prejudicial. The trial court overruled the objection and admitted the exhibit. Terry's pen packet includes certified copies of the indictments and judgments for his 2007 convictions on two counts of indecency with a child by sexual contact for his offenses against M.G. and K.P., including his punishment at nine years and six months for each offense.[2]

---

[2] We identify the victims by using initials. *See* Tex. Const. art. I, § 30(a)(1) (granting crime victims the "right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal justice process").

2

The State also announced to the trial court that it had additional exhibits that had been proven up through deposition and that the State intended to introduce during Terry's testimony. When the State offered Exhibit 3, the defense objected to "the photos and writings[]" on the basis of the best evidence rule and hearsay. The court overruled the objections. The defense then also objected under Rule 403, arguing that the exhibits were "numerous," "gruesome," "inflammatory[,]" contained "explicit detail," and would "unfairly prejudice the jury." The defense further argued that "by the sheer nature of the amount of writings and photographs they are cumulative[]" and would sidetrack or confuse the jury. The State responded that the exhibits

> . . . are very relevant. They are evidence of not only his sexual deviance, but they are evidence of his behavior abnormality, they are evidence of his sexual preoccupation, they are evidence that the expert relied upon in forming his opinion. They are not cumulative, because out of the hundreds of pictures and writings that the State had at its disposal to use during this case, [the State] only selected a very small quantity. . . . about 10[.]"

The court found that the probative value outweighed any prejudicial effect and overruled the defense objections as to Exhibit 3. The State then offered Exhibits 4 through 10, the defense "reurged" its objections and the court overruled and admitted Exhibits 4 through 10.

The State described Exhibit 3 as "a picture that Mr. Terry drew [that] contains writing on it where he actually discusses [] sex with two of the victims[.]" The State argued that in Terry's deposition, Terry characterized Exhibit 4 as "a pornographic writing." The State described Exhibits 5, 6, and 7 as writings by Terry concerning his victims. The State described Exhibit 8 as "a picture cutout with one of the victims' face . . . glued on the picture with a writing about both of the victims[.]" Exhibit 9 was described as "another writing that details some sexual[ly] deviant fantasies of strangulation sex that the doctor used in forming his underlying opinion[.]" And the State described Exhibit 10 as "a graphic picture that [Terry] drew concerning one of the victims[.]"

Requests for Admissions

The State read Terry's responses to requests for admissions into the record. Terry admitted that he had two convictions for indecency with a child by sexual contact, admitted his punishment of nine years and six months in prison for those convictions, and admitted previous convictions for driving under the influence, public intoxication and possession of stolen property. Terry also admitted to having used methamphetamines, PCP, and marijuana, that he had "a problem with alcohol[,]" that during periods in his life, he was "too addicted to work[,]" and that he was under the influence of alcohol when he was accused of sexual offending.

4

Terry also admitted that the first time he had sex was with his adopted sister and that he continues to become sexually aroused by thoughts of her. Terry admitted that he once lost his apartment due to using meth, after which he stored his belongings at his employer's warehouse, including pornographic pictures and writings he had made. He admitted that the writings on the pictures were "of a sexual nature" with respect to his victims and as to other girls he knew, and also that he wrote pornographic writings of sexual fantasies concerning his victims.

Testimony of Terry

The State called Terry as its first witness. At the time of trial, Terry was sixty-four years old, and at that time Terry had served eight-and-a-half years of his nine-and-a-half year sentence for his convictions against M.G. and K.P. Terry agreed that, when he was about eleven years old, he and his sister were placed in foster care and that he was "molested by the foster family[.]"

Terry testified that, after he graduated from high school, he entered the Marine Corps, but while in the Marines he was arrested for PCP and alcohol, and he was subsequently "undesirably discharged" from the Marine Corps. Terry explained that, when he was in the Marine Corps, he would do "whatever [drugs] showed up in the barracks[,]" including LSD, opium, marijuana, and alcohol. According to Terry, he has been arrested for possession of stolen property,

contributing to the delinquency of a minor, DWI, and public intoxication. Terry agreed that he would stop using but then relapse, and that alcohol was "the trickiest substance" for him because he could not predict how he would behave when drinking. According to Terry, "[m]eth took all the money[,]" caused his personality to change, caused him to do things he would not normally do, caused him to lose his apartment, and caused him to become unemployed. Terry also testified that he believed he was a sex addict and that he planned to go to Sex Addicts Anonymous.

According to Terry, prior to his arrest for indecency with a child by sexual contact, he had started using meth again and he lost his apartment due to his meth use. At one point, he lived with his son, who was married and had three children, including M.G. and K.P. Terry agreed that, for a time, he also stayed with a couple who operated a day care in their house, and the couple discovered a box of pornographic material of "dirty pictures and writings" Terry had made and that were in the van Terry drove, and the couple turned the materials over to the police. Terry also agreed that the police thought he had done some of the things contained in the materials and arrested him on charges of indecency with a child by sexual contact for offenses against M.G. and K.P.

Terry described M.G. and K.P. as his son's stepchildren. According to Terry, M.G. and K.P. played a "game" with him one time. He agreed that K.P. climbed

6

onto his lap and wiggled around, and M.G. grabbed his hand and placed it between her legs. According to Terry, when the girls played this game with him, the girls' parents were not around and had left Terry alone to babysit the girls. Terry agreed he became aroused and that he continued to think and fantasize about the girls touching him. Terry also agreed he fantasized about other children after this incident. Terry did not remember touching the girls, but he agreed it was possible that it happened because he was drunk that night and he may have blacked out. Terry also agreed that M.G. was "aggressive[]" and "retarded[]" and that if he had blacked out in the same room with her that night, "she would have participated and [he] would not have had sense enough as an adult to get up and walk away." Terry agreed that the police learned that it was possible he had sexually offended against M.G. and K.P. because he had written pornographic fantasies and made explicit drawings about the girls.

The State showed Exhibit 5 to the jury and asked Terry to read it. The defense requested and obtained a running Rule 403 objection to the State's exhibits. The exhibit was in Terry's handwriting and described in detail "[o]ver 200 times in one year raping [M.G.] in her sleep[]" at Terry's son's house, but Terry testified that it was fantasy and never happened. Terry also agreed that the writing in Exhibit 6, which described sexual interest in "really pretty children[,]"

7

looked like his handwriting but that it was fantasy. Terry disagreed that fantasy was a desire and explained "Fantasy is a thought. A daydream." However, Terry also agreed that, in his deposition prior to trial, he had agreed that the writing in Exhibit 5 was something he had thought about doing to M.G. Terry agreed that State's Exhibit 7 looked like his handwriting and that it was another fantasy about M.G. in which he "graduated from just fantasizing about her to actually touching her[.]" Terry described State's Exhibit 8 as a drawing of M.G. and he stated that it looked "nasty" to him. Terry testified that he was high on methamphetamine when he made the drawing, that he cut out pictures and glued them onto bodies, and that he "wrote disgusting things."

Terry agreed that State's Exhibit 3 was one of his writings, but he did not recall who the girl was in the picture, and he agreed it was just a fantasy. Terry agreed that he had had fantasies about K.P. and made drawings of her, and he recognized his handwriting in State's Exhibit 10, a sexual writing concerning K.P. that described her as "only five years old." According to Terry, he found K.P. sexy but Exhibit 10 was a fantasy that did not happen. Terry testified that M.G. said "suggestive things[]" to him on more than one occasion, and when she did so, she was "aggressive[,]" would force herself onto him, and would touch him. He denied

having a physical reaction when M.G. said these things, and according to Terry he would "get up and move away[]" or leave in his truck when it occurred.

Terry agreed that, in his deposition, he had described writing sexual fantasies about fourth-graders in bikinis. When asked whether he had fantasized having sex with dead bodies, in reference to the writing in State's Exhibit 4, Terry responded "[i]t looks like it." And when the State questioned Terry about the writing in Exhibit 9, Terry agreed that it "looks like" he fantasized about kidnapping young girls, strangling them, and having sex with their dead bodies while their mothers watched. But, Terry stated the writing was fantasy. Terry agreed that "there were many, many more documents" than what the State introduced at trial. Terry testified that he was attracted to female adults but also "[s]ometimes[]" to female children. He agreed he fantasized about JonBenet Ramsey and that when he grew bored with "standard Penthouse pornography[]" his taste grew towards forbidden fantasies and he created his own materials.

Terry agreed that he was required to take sex offender education as a condition of parole. According to Terry, he had been caught in prison having a picture of a woman in her underwear, but Terry explained that he did not know he had the picture in his possession and he had forgotten about it. Terry testified that he had completed the Sex Offender Education Program and, when asked what he

learned, he replied "Don't be a sex offender." Terry agreed that he is a sex offender and that he needs sex offender treatment but Terry does not believe he is at risk for reoffending. According to Terry, upon release from prison, he intends to go back to Alcoholics Anonymous. Terry testified that he had not heard from family or anyone while in prison, he was on a waiting list for housing, and when asked how he planned on avoiding returning to prison, he stated "[a]void pornography, drugs, alcohol, try to just be a good sign painter. . . . I'm a good sign painter." Terry explained that he no longer writes pornographic material.

On examination from his own attorney, Terry agreed that he had ruined his victims' lives and that he "earned" his punishment and deserved his imprisonment. He denied that he currently has sexual fantasies involving children or finds abusing children to be sexually exciting. When asked how he felt about his sexual offenses, he replied "[g]uilty, ashamed, embarrassed." Terry testified that he had been sober since he has been in prison, even though drugs were available in prison, and he did not want the consequences of drinking. Terry explained he had four "minor cases[]" while he was in prison, including failing to put his name in some paperback books and skipping a class. He denied having been in trouble for making sexual advances toward female prison staff, and he explained that his sex drive had "dwindled, dried up[]" while in prison.

Testimony of Dr. David Self

David Self, M.D. (Self or Dr. Self), a physician and board-certified psychiatrist, testified as an expert for the State. Self explained that he had been practicing forensic psychiatry since 1995, that he has been evaluating individuals for a behavior abnormality since 2009, that he relied on the principles of forensic psychiatry when evaluating Terry, and that his testimony was within the scope of forensic psychiatry. Dr. Self testified that he was asked to answer whether Terry had a behavioral abnormality as defined by Chapter 841 of the Texas Health and Safety Code. Self then explained that a behavioral abnormality is a condition that affects someone's volition or ability to control their emotions and predisposes them to be a risk of harm to others via sexually violent acts.

Dr. Self described the methodology he uses in conducting a behavioral abnormality assessment, which includes a review of all available records and conducting a face-to-face psychiatric screening. He agreed that the methodology he uses is the methodology used by experts performing this type of evaluation in Texas. After reviewing records and interviewing Terry, Dr. Self formed an opinion that Terry has a behavioral abnormality that predisposes him to engage in predatory acts of sexual violence.

Dr. Self met with Terry for almost two hours, and he described Terry's demeanor during the meeting as "easy-going. . . . open, cordial and forthcoming." Self explained that he reviewed police reports, prison records, an interview by the Sex Offender Treatment Program, and a psychological evaluation done by a psychologist. Although Dr. Self testified that he reviewed the Multidisciplinary Team (MDT) report, Self also testified that Terry had refused to see the psychologist who evaluated Terry. After meeting with Terry, Dr. Self also received records from the District Attorney's office that prosecuted Terry and a copy of Terry's deposition.

Dr. Self explained that he relied in part on Terry's sexual convictions in forming his opinion that Terry suffers from a behavior abnormality and that the facts and details of his convictions concerning victim characteristics, the nature of the offenses, and the context in which they occur are important "clues." Self also found the compendium of Terry's pornographic drawings and writings to be "very helpful." Dr. Self testified that the records showed that Terry was fifty-five years old when he was indicted for offenses against M.G. and K.P. Self explained that at the time of the sexual offenses, M.G. was eleven years old, K.P. was six years old, and the two girls were the daughters of Terry's son's "common-law wife or paramour." According to Dr. Self, the records described M.G. as "mentally

retarded[]" and as having cerebral palsy. Dr. Self explained that, at the time of the offenses, Terry's employer let Terry use a van with the understanding that, if Terry "got drunk, he would lose the van." Dr. Self explained that Terry did get

> . . . drunk and stoned on meth . . . and lost the van. And when they took [the van] back, they discovered . . . two shoeboxes full of these pornographic writings and graphics.

> . . . .

> Because they recognized [that] some of it was about children being molested in violent ways, they called the police.

After examining the materials, the police were able to identify M.G. and K.P. as the potential victims, and M.G. and K.P. were interviewed at a child advocacy center and by a sexual abuse nurse examiner (SANE). According to Dr. Self, the SANE found "clear evidence of sexual abuse." Dr. Self further explained that K.P. had made an outcry to her mother, saying that Terry had threatened to kill her if she told her father that Terry was touching her. M.G. also made an outcry to her mother that was "fairly minimal[.]" Self testified that, when he asked Terry about these events, Terry "was very vague[]" and said he was intoxicated on alcohol and meth during the offenses. Dr. Self explained that substance abuse "make[s] it a lot easier to pursue impulsive urges."

According to Dr. Self, Terry first recognized that he had an attraction to prepubescent children when the JonBenet Ramsey story was first in the news. Dr.

13

Self testified that he asked Terry about the offenses against M.G. and K.P. and that Terry told him there had been two or three instances of molestation and that Terry "attributed the initiation of these things to the children's behavior[.]" Self also testified that Terry told him M.G. made sexually suggestive comments to Terry, although Self found it "abnormal[,]" "unusual[,]" and "incredulous that an 11-year-old girl is going to be that directly promiscuous and inviting to an old man." Dr. Self explained that it is common for pedophiles to excuse their behavior by saying the child initiated the contact. According to Dr. Self, Terry's rationalization and self-justification are relevant to Terry's mindset today because it means "he's still defending that behavior[]" and "he is building a rationalization instead of confronting the ugly truth."

When Dr. Self asked Terry about the writings, Terry "wanted to more or less dismiss them as products of methamphetamine and alcohol[]" and Terry stated that he had started making the writings before he had even been around M.G. and K.P. because "he had grown bored with Penthouse and [the] regular kind of pornography and needed something with more punch." Dr. Self described this as "stepping up . . . when one level of offense of any sort, violent or sexual, starts to lose its thrill, [] there's an escalation in seriousness." Dr. Self reviewed the writings and pictures that referenced M.G. and K.P. and explained that they

14

described "incredibly sadistic and cruel sexual assaults on these little girls." Dr. Self explained that some of the pictures Terry drew were of adult female bodies and some were prepubescent children. According to Dr. Self, there was no evidence that Terry had actually done the things he wrote about. However, Dr. Self testified that the records he reviewed reflected that Terry "did more than just casually touch the girls on one occasion[]" and that both girls had reported "it had happened several times." Dr. Self explained that "quite a few[]" writings or pictures of Terry contributed to his opinion that Terry has a behavior abnormality and that the writings show Terry's "taste for the extraordinarily vulnerable victim[.]" On cross-examination Dr. Self acknowledged that Terry's writings and pictures depict "fantasies[,]" but Self explained that a "risk inherent" exists and in the "stepping-up process[,]" a person moves from fantasy and thinking to "doing more." According to Dr. Self, there were many more writings and pictures than what the State presented to the jury.

Self testified that Terry met the criteria for pedophilic disorder, and this diagnosis was pertinent to his opinion that Terry has a behavioral abnormality. Self also agreed that sexual sadism was a "distinct possibility[]" for Terry. Self explained that pedophilia is a chronic condition that does not go away, but that the behavior resulting from pedophilic urges has been observed to diminish with age.

15

According to Dr. Self, Terry did not admit to the urges and Terry minimized his offenses. When Dr. Self asked Terry what harm he had caused M.G. and K.P., Terry was not sure how they were harmed and "he kind of minimized it and said that he's sure nothing good came of it." Dr. Self also explained that he found Terry to have attitudes tolerant of sexual assault based on Terry's rationalization of his offenses; Terry blames the incidents on the girls, and Terry's writings portray sexual assault as "a happy thing[.]"

According to Dr. Self, Terry's sexual and nonsexual criminal history contributes to his risk of reoffending. Dr. Self diagnosed Terry with "personality disorder not otherwise specified[]" and explained that Terry has antisocial traits but not antisocial personality disorder. Dr. Self explained that "a personality disorder that causes you to have friction with other people definitely contributes to instability[.]" Dr. Self agreed that he had seen no evidence that Terry had a major mental illness. Self also testified that Terry also has a "very significant history of substance abuse[,]" including abuse of methamphetamine, alcohol, and marijuana. Dr. Self diagnosed Terry with methamphetamine and alcohol dependence in remission in a controlled environment. Addressing the correlation and relevance of Terry's drug abuse and dependence on Terry's behavior abnormality, Dr. Self explained that

16

> . . . drugs like this don't cause you to have ideas about raping kids. But if you have ideas about raping kids or any bad ideas that you're trying to inhibit and keep a lid on, drugs like this make it easy to act on those ideas. They disinhibit. They make you more aggressive, more impulsive and raise the risk through the roof. These are the two huge risk raisers in all substance abuse.

According to Dr. Self, Terry made "a pretty good adjustment" in prison and the "most significant thing" that occurred while Terry was in prison is that Terry was found to possess a "very provocative picture of a woman in a sexual pose[]" near the end of the time when he was in the Sex Offender Education Program. In Dr. Self's opinion, Terry needs sex offender treatment, and he was "inclined to think" that Terry did not believe he needed such treatment and that Terry "wants to avoid that environment." Dr. Self testified that he believes Terry acknowledges his deviance but that he does not understand the risk he poses. Self also agreed that there is no evidence Terry has used drugs or alcohol in prison or that Terry has continued making writings or pictures in prison.

Addressing the risk factor of general instability, Dr. Self observed that Terry has "a fairly erratic history of employment[,]" he has been homeless at various times, and he has no social support network. Dr. Self agreed that the psychologist who evaluated Terry wrote that Terry appeared to have the intellectual ability to maintain steady employment, which the psychologist regarded as a mitigating factor. Self told the jury that

17

> . . . [p]eople that have [substance abuse] diagnoses and have no social support network and have other sources of psychosocial stress, the risk of relapse is even higher and the risk of relapse increases the risk of sexual recidivism. So it's a chain reaction kind of a deal.

Dr. Self also testified that Terry has only had a four-month sex offender education program but no treatment, which put Terry at a higher risk for reoffending upon release from prison. Terry's age was a protective factor that could mediate his risk for reoffending, although Dr. Self could not say how much of a protective factor age was in Terry's case because the records indicate Terry started offending at age fifty-five. Dr. Self identified no other protective factors for Terry.

Terry scored "zero[]" on the Static-99R actuarial scored by a licensed psychologist, and Terry's score is associated with a low risk of reoffending. Dr. Self testified that the actuarial did not consider Terry's "[t]wo shoeboxes full of drawings and writings that indicate an extraordinary preoccupation with sadistic pedophilic fantasy[]" and Terry's score on the actuarial did not accurately indicate Terry's current level of risk.

Dr. Self explained that Terry had told him that Terry's "whole plan[]" upon release was that he "would go wherever they sent him[]" and "try to get connected" with AA and sex addicts anonymous groups. Dr. Self explained that the prospect of Terry going to a sex addicts group was "problematic[]" because many people who go to such groups are insincere and negative relationships are

18

formed, and, as a result of reading Terry's deposition, Self was concerned that Terry wanted to "get hooked up with [] Sex Addicts Anonymous to find friends or other people who write weird stuff like him[.]" According to Dr. Self, Terry was not able to articulate a plan to avoid sexual re-offense and, in Self's opinion, Terry did not have the tools to control the factors in his life that put him at a high risk of reoffending.

Verdict and Post-Trial Motions

The State moved for a directed verdict on the issue of repeat sexual offender, which the court granted, and the State rested its case. The defense then moved for a directed verdict "on the grounds that the State has failed to comply with the prerequisite of Chapter 841.023(a)[]" because "there was no testing for psychopathy done[]" either by the psychologist or by Dr. Self.[3] The court denied the defense's motion for directed verdict, and the defense rested without calling any witnesses.

The jury found beyond a reasonable doubt that Terry is a sexually violent predator. The defense moved for judgment notwithstanding the verdict, and the

---

[3] Section 841.023(a) addresses the pre-petition assessment for behavioral abnormality and states, in relevant part, "[t]he expert shall make a clinical assessment based on testing for psychopathy, a clinical interview, and other appropriate assessments and techniques to aid the department in its assessment." Tex. Health & Safety Code Ann. § 841.023(a) (West Supp. 2016).

19

court ordered briefing concerning whether an examination for psychopathy is required by Chapter 841, whether failure to conduct a psychopathy exam is jurisdictional, whether a jurisdictional proceeding may be raised at any point in the proceeding, and whether Dr. Self's testimony that he diagnosed Terry with antisocial traits was evidence that Self conducted an examination regarding psychopathy. After a hearing on the motion, the court denied Terry's Request for Judgment Notwithstanding the Verdict and the trial court entered its final judgment and order of commitment. Terry filed a motion for new trial, which the trial court denied, and Terry timely filed an appeal.

THE SVP STATUTE

In an SVP civil commitment proceeding, the State bears the burden to prove beyond a reasonable doubt that the respondent is a sexually violent predator. *See* Tex. Health & Safety Code Ann. § 841.062 (West 2010); *In re Commitment of Morales*, 98 S.W.3d 288, 291 (Tex. App.—Beaumont 2003, pet. denied). A person is a sexually violent predator if the person "is a repeat sexually violent offender[] and suffers from a behavioral abnormality that makes the person likely to engage in a predatory act of sexual violence." Tex. Health & Safety Code Ann. § 841.003(a) (West Supp. 2016). A behavioral abnormality is "a congenital or acquired condition that, by affecting a person's emotional or volitional capacity,

20

predisposes the person to commit a sexually violent offense, to the extent that the person becomes a menace to the health and safety of another person." *Id.* § 841.002(2) (West Supp. 2016).

CONSTITUTIONAL CHALLENGE

In his first issue, Terry argues that the SVP statute as amended by Senate Bill 746 is facially unconstitutional because it requires all persons adjudicated as sexually violent predators to live in "total confinement" with "severe criminal penalties" for violating certain requirements of civil commitment, and as amended fails the "intent-effects test" utilized by the Texas Supreme Court in *In re Commitment of Fisher*, 164 S.W.3d 637 (Tex. 2005). Terry contends that the findings of a trial court judge as to another civilly-committed person, Alonzo May, equally apply to Terry, and Terry argues that the Supreme Court's holding in *Fisher* depended heavily on the fact that the prior version of the statute provided for outpatient treatment. Terry also argues that the statutory provisions of "an 'inpatient' civil-commitment program in a 'total confinement facility'" in combination with criminal penalties for violating certain requirements of civil commitment "tipped Chapter 841 into the punitive realm[.]"

Effective June 17, 2015, Senate Bill 746 amended Chapter 841 of the Texas Health and Safety Code in several respects. *See* Act of May 21, 2015, 84th Leg.,

R.S., ch. 845, 2015 Tex. Sess. Law Serv. 2700, 2700-12 (hereinafter S.B. 746). The Legislature created a new state agency, the Texas Civil Commitment Office (TCCO), with the responsibility for treatment and supervision of sexually violent predators.[4] *Id.* § 3 (current version at Tex. Health & Safety Code Ann. § 841.007 (West Supp. 2016)). The Legislature required the TCCO to develop a tiered program of supervision and treatment that provides a seamless transition from a total confinement facility to less restrictive housing and supervision and eventual release from civil commitment, based on the person's behavior and progress in treatment. *Id.* § 16 (current version at Tex. Health & Safety Code Ann. § 841.0831 (West Supp. 2016)). Under the statute as amended, the TCCO transfers a committed person to less restrictive housing and supervision if the transfer is in the best interests of the person and conditions can be imposed that adequately protect the community, and a committed person may petition the court for a transfer to less restrictive housing and supervision. *Id.* (current version at Tex. Health & Safety Code Ann. § 841.0834 (West Supp. 2016)). The enacting language of SB 746 provides:

---

[4] *See* Tex. Gov't Code Ann. § 420A.002 (West Supp. 2016). Throughout this opinion we refer to the Texas Civil Commitment Office by its acronym, "TCCO." The Office of Violent Sex Offender Management (OVSOM) was the predecessor agency to the TCCO.

If a civil commitment requirement imposed under Chapter 841, Health and Safety Code, before the effective date of this Act differs from any of the civil commitment requirements listed in Section 841.082, Health and Safety Code, as amended by this Act, the applicable court with jurisdiction over the committed person shall, after notice and hearing, modify the requirement imposed as applicable to conform to that section.

*Id.* § 40(b).

When the Texas Legislature implemented the tiered treatment program in 2015, it simultaneously reduced the number of conditions of commitment. Specifically, the Legislature deleted three conditions of civil commitment: (1) prohibiting the person's possession or use of alcohol, inhalants, or a controlled substance; (2) if determined appropriate by the judge, establishing a child safety zone in the same manner as a child safety zone is established by a judge under Section 13B, Article 42.12, Code of Criminal Procedure and requiring the person to comply with requirements related to the safety zone; and (3) "any other requirements determined necessary by the judge." *See* S.B. 746 § 15. Furthermore, the 2015 Legislature changed section 841.085 so that violations of only certain provisions of section 841.082 constitute a criminal offense. *Id.* § 19.

Generally, to preserve a complaint for appellate review, the complaining party must present the complaint to the trial court by timely request, objection, or motion. Tex. R. App. P. 33.1(a)(1). We apply the preservation rule to constitutional

challenges. *See In re Commitment of Lucero*, No. 09-14-00157-CV, 2015 Tex. App. LEXIS 1098, at *25 (Tex. App.—Beaumont Feb. 5, 2015, pet. denied) (mem. op.) (failure to make a constitutional challenge to the SVP statute at trial constituted a failure to preserve the issue for appeal); *In re Commitment of Dodson*, 434 S.W.3d 742, 747 (Tex. App.—Beaumont 2014, pet. denied) (failure to make a constitutional challenge to the SVP statute at trial constituted a failure to preserve the issue for appeal); *In re Commitment of Johnson*, 153 S.W.3d 129, 130 (Tex. App.—Beaumont 2004, no pet.) ("A complaint regarding the constitutionality of a statute is subject to the ordinary rules of procedural default.").[5]

The statutory amendments about which Terry complains became effective on June 17, 2015, and Terry's trial began on October 5, 2015. Terry filed his motion for judgment notwithstanding the verdict on October 12, 2015, and he filed

---

[5] *See also In re L.M.I.*, 119 S.W.3d 707, 710-11 (Tex. 2003) (parent failed to preserve his due process challenge); *Sw. Elec. Power Co. v. Grant*, 73 S.W.3d 211, 222 (Tex. 2002) (party failed to raise constitutional argument that trial court's ruling violated open-courts provision in response to summary judgment motion and thus did not preserve it for appeal); *Dreyer v. Greene*, 871 S.W.2d 697, 698 (Tex. 1993) (party waived due process and equal protection challenges by failing to raise them in trial court); *Lowe v. Jefferson Dental Clinics*, No. 05-11-00902-CV, 2012 Tex. App. LEXIS 3796, at **4-5 (Tex. App.—Dallas May 14, 2012, no pet.) (mem. op.) (appellant failed to preserve her challenge to the constitutionality of Chapter 74 by failing to raise the complaint in the trial court); *In re J.R.N.*, No. 09-08-00029-CV, 2010 Tex. App. LEXIS 2280, at **8-9 (Tex. App.—Beaumont Apr. 1, 2010, no pet.) (mem. op.) ("The law is well settled that even constitutional errors may be waived by failure to raise the issues at trial.").

his motion for new trial on October 28, 2015, neither of which raised a constitutional challenge. The appellate record indicates that Terry did not raise the issue of the constitutionality of the SVP statute as amended before or during trial, and he failed to raise the issue in his post-trial motions. Therefore, he failed to preserve this issue for appellate review. *See* Tex. R. App. P. 33.1.

Nevertheless, Terry argues that, after his own trial had concluded and the court denied his motion for new trial, a different trial court that was hearing Alonzo May's civil commitment case declared Chapter 841 as amended unconstitutionally punitive. *See In re Commitment of May*, No. 09-15-00513-CV, 2016 Tex. App. LEXIS 8058, at \*\*5-8 (Tex. App.—Beaumont July 28, 2016, no pet. h.). Citing to *Ex parte Chance*, 439 S.W.3d 918 (Tex. Crim. App. 2014) (Cochran, J., concurring) and *Ex parte Fournier*, 473 S.W.3d 789 (Tex. Crim. App. 2015), Terry argues that his constitutional claim on appeal should be considered timely because "'a person may always obtain relief from an indictment or a conviction based on a penal statute that has been previously declared unconstitutional.'" *See Chance*, 439 S.W.3d at 919 (Cochran, J. concurring). We find *Chance* and *Fournier* inapposite because those cases pertained to the constitutionality of a penal statute, and the SVP commitment statute is a civil statute. *See Fisher*, 164 S.W.3d at 653 (explaining that the SVP statute is civil);

25

*May*, 2016 Tex. App. LEXIS 8058, at \*17 (concluding that the SVP statute, as amended in 2015, remains civil).

Even if Terry's challenge had been timely raised, as we explained in *May*, Chapter 841, as amended in 2015, is not unconstitutional. *See May*, 2016 Tex. App. LEXIS 8058, at \*\*7-18. In *May*, we specifically examined and applied the factors as outlined in *Fisher*. *Id.* As to Terry's argument that the statute as amended is unconstitutionally punitive because it requires "total confinement" as well as provides for "severe criminal penalties" for violating certain requirements of civil commitment, we are unpersuaded. Taken as a whole, the 2015 amendments reduce the possibility that a person subject to an SVP civil commitment order is punished criminally for violation of that order. Moreover, "the United States Supreme Court has never held that the imposition of criminal penalties for violating a civil regulatory scheme *ipso facto* renders an act punitive, rather than civil." *See Fisher*, 164 S.W.3d at 652-53 (citing *Smith v. Doe*, 538 U.S. 84, 90, 105-06 (2003) (holding that Alaska Sex Offender Registration Act was civil even though a knowing failure to comply would subject the offender to criminal prosecution) and *Hawker v. New York*, 170 U.S. 189, 192-94, 200 (1898) (holding that New York statute prohibiting felons from obtaining licenses to practice medicine did not violate the ex post facto clause, despite criminal penalties

imposed for failure to comply and explaining that "such legislation is not to be regarded as a mere imposition of additional penalty, but as prescribing the qualifications for the duties to be discharged and the position to be filled")). Terry has failed to meet his burden of providing "the clearest proof" that the SVP statute as amended is so punitive in either purpose or effect as to negate the stated Legislative intent that it be civil. *See Kansas v. Hendricks*, 521 U.S. 346, 361 (1997) (quoting *United States v. Ward*, 448 U.S. 242, 248-49 (1980)). For this reason and for the same reasons discussed in *May*, we conclude the statute remains civil, and we reject Terry's constitutional challenge. We overrule Terry's first issue.

ADMISSION OF EVIDENCE

In his second issue, Terry argues that the trial court erred in admitting State Exhibits 3 through 10 because their probative value was substantially outweighed by the danger of unfair prejudice. According to Terry, the State described these exhibits as "graphic and downright disturbing," the exhibits "created a danger of arousing the jury's hostility toward Mr. Terry without regard to the logical probative force of this evidence[,]" and there was a "very real danger" that the jury could have improperly based its verdict on this evidence. Although we read Appellant's brief to concede that the evidence was relevant, Appellant then argues

that the exhibits "added nothing of any consequence to the [State's] case except to inflame the jury against Mr. Terry."

We review the admission or exclusion of evidence under an abuse of discretion standard. *City of Brownsville v. Alvarado*, 897 S.W.2d 750, 753 (Tex. 1995); *In re Commitment of McCarty*, No. 09-12-00083-CV, 2013 Tex. App. LEXIS 7855, at **4-5 (Tex. App.—Beaumont June 27, 2013, pet. denied) (mem. op.). A trial court abuses its discretion when it acts without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985). We will not reverse a judgment on the admission or exclusion of evidence unless an appellant establishes that the trial court's ruling was in error and that the error was reasonably calculated to cause and probably did cause the rendition of an improper judgment. *See McCarty*, 2013 Tex. App. LEXIS 7855, at *5; *see also* Tex. R. App. P. 44.1(a)(1).

Texas law presumes that relevant evidence is more probative than prejudicial. *See* Tex. R. Evid. 402; *In re Commitment of Winkle*, 434 S.W.3d 300, 309 (Tex. App.—Beaumont 2014, pet. denied). Relevant evidence may nonetheless be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. Tex. R. Evid. 403. However, Rule 403 should be used "sparingly[]" to exclude relevant evidence. *See Winkle*, 434 S.W.3d at 309.

28

"Evidence is unfairly prejudicial when it has an undue tendency to suggest that a decision be made on an improper basis, commonly, but not necessarily, an emotional one." *In re Commitment of Anderson*, 392 S.W.3d 878, 882 (Tex. App.—Beaumont 2013, pet. denied). A trial court's Rule 403 balancing test includes, but is not limited to, the following considerations: (1) the probative value of the evidence, (2) the potential for the evidence to impress the jury in some irrational way, (3) the time needed to develop the evidence, and (4) the proponent's need for the evidence. *Id.* "The trial court has discretion to determine whether the probative value of proffered evidence is substantially outweighed by the danger of unfair prejudice." *Waffle House, Inc. v. Williams*, 313 S.W.3d 796, 812 (Tex. 2010). We assume the trial court applied the Rule 403 balancing factors, but it need not have done so on the record. *See In re Commitment of Haines*, No. 09-15-00526-CV, 2016 Tex. App. LEXIS 6405, at *16 (Tex. App.—Beaumont June 16, 2016, no pet.) (mem. op.) (citing *Allstate Tex. Lloyds v. Potter*, 30 S.W.3d 658, 662 (Tex. App.—Texarkana 2000, no pet.)). The jury is the exclusive judge of the weight and credibility of evidence at trial. *See In re Commitment of Rushing*, No. 09-11-00268-CV, 2012 Tex. App. LEXIS 8140, at **1-2 (Tex. App.—Beaumont Sept. 27, 2012, no pet.) (mem. op.) (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005)); *see also Kirk v. State*, 421 S.W.3d 772, 783-84 (Tex.

App.—Fort Worth 2014, pet. ref'd) (It is within the province of the jury, as sole judge of the evidence, to determine whether provocative demonstrative evidence bears on an ultimate issue or merely portrays a defendant in a distasteful light.).

A party seeking to reverse a judgment based on evidentiary error must prove that the judgment turned on the particular evidence that was excluded or admitted. *See In re Commitment of Sells*, No. 09-15-00172-CV, 2016 Tex. App. LEXIS 3916, at *26 (Tex. App.—Beaumont, Apr. 14, 2016, pet. denied) (mem. op.) (citing *Interstate Northborough P'ship v. State*, 66 S.W.3d 213, 220 (Tex. 2001)). The erroneous "admission or exclusion [of evidence] is likely harmless if the evidence was cumulative, or if the rest of the evidence was so one-sided that the error likely made no difference." *Reliance Steel & Aluminum Co. v. Sevcik*, 267 S.W.3d 867, 873 (Tex. 2008) (footnote omitted); *Wesbrook v. State*, 29 S.W.3d 103, 119 (Tex. Crim. App. 2000) (erroneous admission of evidence is harmless where the evidence reflects such evidence did not "move[] the jury from a state of nonpersuasion to one of persuasion as to the issue in question[]"); *Kirk*, 421 S.W.3d at 783-84 (no harm to admit provocative photographs that may have portrayed defendant in a distasteful light because the record did not reflect that the photographs likely moved the jury from acquitting to convicting defendant).

Exhibits 3 through 10 provide evidence of Terry's sexual preoccupation, and Dr. Self explained that he reviewed and relied upon the documents in forming his opinion that Terry currently has a behavioral abnormality. Terry testified that he had written pornographic fantasies and had made explicit drawings about M.G. and K.P. Dr. Self testified that State's Exhibits 3 through 10 reflected a pattern in Terry's behavior of "stepping up," which is an "escalation in seriousness[]" of his behavior, and that there was a "risk" that Terry would move from fantasy and thinking to "doing more[]" or acting on impulses. We have repeatedly approved the admission of an expert's basis evidence in SVP cases. *See In re Commitment of Alvarado*, No. 09-13-00217-CV, 2014 Tex. App. LEXIS 3343, at \*\*26-30 (Tex. App.—Beaumont Mar. 27, 2014, pet. denied) (mem. op.) ("Trial courts have discretion to admit the underlying facts or data on which an expert has based an opinion."); *In re Commitment of Day*, 342 S.W.3d 193, 197-99 (Tex. App.— Beaumont 2011, pet. denied). State's Exhibit 3 through 10 were created by Terry and were considered by Dr. Self in developing his opinion. Citing to *Salazar v. State*, 90 S.W.3d 330 (Tex. Crim. App. 2002), Terry argues that a Rule 403 balancing test requires a court to consider, among other factors, the proponent's need for the evidence, and that in this case, the State did not articulate "a specific need it had for these exhibits beyond what other evidence available . . . already

undisputedly established." Assuming without deciding that a trial court must consider the proponent's need for the evidence, we conclude that the trial court could have reasonably concluded the State demonstrated its need for this evidence because the record reflects that Dr. Self relied upon and reviewed the evidence in forming his opinion, and Exhibits 3 through 10 illustrated Terry's "stepping up" process as well as Terry's sexual preoccupation.

Citing to *Salazar* and *Casey v. State*, 215 S.W.3d 870 (Tex. Crim. App. 2007), Appellant also complains that "without having explicitly weighed and balanced these factors and without having articulated a rationale for admitting these exhibits, the trial court's ruling is not entitled to the 'greatest deference.'" A trial court need not conduct its Rule 403 balancing test on the record. *See Haines*, 2016 Tex. App. LEXIS 6405, at *16; *see also Santellan v. State*, 939 S.W.2d 155, 173 (Tex. Crim. App. 1997) ("Although appellant asserts that the trial court did not perform the balancing test, the trial court did not explicitly refuse to do the test, it simply overruled appellant's Rule 403 objections. We find nothing in the record to indicate that the trial court did not perform a balancing test, albeit a cursory one."). Appellant points to nothing in the record to support his assertion that the trial court failed to conduct a Rule 403 balancing test. *See* Tex. R. App. P. 38.1(i). Furthermore, Appellant's argument that admission of the exhibits created "a very

real danger that the jury could have improperly based its verdict on this evidence alone" falls short of Appellant's burden to show that the judgment actually turned on the particular evidence that was admitted. *See Sells*, 2016 Tex. App. LEXIS 3916, at *26. On the record before us, we cannot conclude the trial court abused its discretion in admitting the evidence or that any error in the admission of Exhibits 3 through 10 probably resulted in an improper judgment. *See* Tex. R. App. P. 44.1(a)(1); *McCarty*, 2013 Tex. App. LEXIS 7855, at *5. We overrule Appellant's second issue on appeal.

## LEGAL AND FACTUAL SUFFICIENCY

In his third issue, Appellant argues that, even assuming the evidence upon which the experts relied was reliable, the evidence at trial was legally and factually insufficient to support the jury's finding beyond a reasonable doubt that Terry has a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence. In particular, Appellant argues that because Dr. Self testified that the word "likely" is not defined in the statute but means "beyond a mere possibility of harm[,]" the jury's verdict means "the jury found[] that Mr. Terry has a behavioral abnormality because it is 'beyond a mere possibility' that Mr. Terry will offend."

33

Under a legal sufficiency review, we assess all the evidence in the light most favorable to the verdict to determine whether a rational trier of fact could find, beyond a reasonable doubt, the elements required for commitment under the SVP statute. *In re Commitment of Mullens*, 92 S.W.3d 881, 885 (Tex. App.—Beaumont 2002, pet. denied). It is the factfinder's responsibility to fairly resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from basic facts to ultimate facts. *Id.* at 887. Under a factual sufficiency review, we weigh the evidence to determine "whether a verdict that is supported by legally sufficient evidence nevertheless reflects a risk of injustice that would compel ordering a new trial." *Day*, 342 S.W.3d at 213.

We have previously concluded in other SVP civil commitment appeals that Dr. Self's working definition of likely being defined as "more than a mere possibility" does not render the evidence in an SVP civil commitment case legally or factually insufficient. *See In re Commitment of Muzzy*, No. 09-13-00496-CV, 2014 Tex. App. LEXIS 4750, at **5-7 (Tex. App.—Beaumont May 1, 2014, pet. denied) (mem. op.). In *Muzzy* we stated:

> . . . First, Muzzy complains of the experts' definitions of "likely." Self defined "likely" as "[m]ore than a mere possibility." [Another expert] explained that the meaning of "likely" is "up to each individual evaluator or clinician[,]" but that he believed "likely" to mean "a pretty good chance something is going to happen." Muzzy argues that both these definitions fail to "comport with the

constitutional requirements for involuntary civil commitment." However, this Court has rejected the notion that the term "likely" has a precise definition of the type associated with any certain assigned percentage of risk. *In re Commitment of Kalati*, 370 S.W.3d 435, 439 (Tex. App.—Beaumont 2012, pet. denied). Additionally, the experts' testimony is not insufficient merely because the term "likely" is not defined by the statute or case law. *In re Commitment of Kirsch*, No. 09-08-00004-CV, 2009 Tex. App. LEXIS 5436, at *17 (Tex. App.— Beaumont July 16, 2009, pet. denied) (mem. op.). Nor does an expert's explanation of the term "likely," in and of itself, render the evidence insufficient to support a jury's finding that a person suffers from a behavioral abnormality. *Id.* at *19. Rather, an expert's definition merely goes to the weight that the jury might give the expert's testimony. *Id.*

*Id.*; *see also Rushing*, 2012 Tex. App. LEXIS 8140, at **4-5 ("Noticeably absent from the statute describing a sexually violent predator is any requirement that the person's behavioral abnormality make the person *more likely than not* to engage in a predatory act of sexual violence.") (emphasis in original).

In this case, Dr. Self testified that Terry suffers from a behavioral abnormality that predisposes him to engage in a predatory act of sexual violence. Dr. Self diagnosed Terry with pedophilic disorder and explained that pedophilia is a chronic condition that does not go away. Self also characterized Terry as having an attitude that was tolerant of sexual assault, as denying his urges, and as rationalizing his offenses and blaming his victims. Self also diagnosed Terry with antisocial traits, personality disorder not otherwise specified, and methamphetamine and alcohol dependence in remission in a controlled

environment. Self explained that substance abuse increases the risk of reoffending because drugs disinhibit and make a person "more aggressive, more impulsive and raise the risk through the roof." According to Dr. Self, Terry's history of employment instability and his lack of social support put Terry at a higher risk of relapse. Self further explained that the fact that Terry had not had any sex offender treatment also increases Terry's risk for reoffending. Terry himself testified that he "[s]ometimes[]" is attracted to female children. He also agreed he is a sex offender and needs sex offender treatment, but he does not believe he is at risk of reoffending. Terry also agreed he has possessed a prohibited photograph of a partially-clad woman while in prison.

The jury was entitled to infer Terry's current dangerousness from the evidence presented, including the experts' testimony, Terry's past behavior, and Terry's own testimony. *See In re Commitment of Wilson*, No. 09-08-00043-CV, 2009 Tex. App. LEXIS 6714, at *14 (Tex. App.—Beaumont Aug. 27, 2009, no pet.) (mem. op.). As the sole judge of the weight and credibility of the evidence, the jury could reasonably conclude that Terry suffers from a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence. *See In re Commitment of Lowe*, No. 09-14-00098-CV, 2014 Tex. App. LEXIS 10034, at *6 (Tex. App.—Beaumont Sept. 4, 2014, no pet.) (mem. op.); *see also*

*Wilson*, 2009 Tex. App. LEXIS 6714, at \*14; *Mullens*, 92 S.W.3d at 887. We conclude that the jury's verdict is supported by legally sufficient evidence and does not reflect a risk of injustice that would compel ordering a new trial. *See Day*, 342 S.W.3d at 213. We overrule Terry's third issue on appeal.

Having overruled all Terry's issues on appeal, we affirm the trial court's judgment and order of civil commitment.

AFFIRMED.

_____
LEANNE JOHNSON
Justice

Submitted on July 14, 2016
Opinion Delivered December 15, 2016

Before McKeithen, C.J., Kreger and Johnson, JJ.